IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION


GREEN PARTY OF ARKANSAS,
REBEKAH KENNEDY, and MARK SWANEY          PLAINTIFFS


v.                    Case No.  4:09-cv-695-DPM


CHARLIE DANIELS, in his official capacity
as Secretary of State of the State of Arkansas          DEFENDANT


## MEMORANDUM OPINION AND ORDER

The question presented is whether Arkansas's statute defining a political party—how a group of voters becomes a party and stays a party—is unconstitutional when applied to the Green Party of Arkansas. The Party and two of its members (collectively the Green Party) challenge Ark. Code Ann. § 7-1-101(21) (Supp. 2009) as imposing an unconstitutional burden on their First and Fourteenth Amendment rights to participate in State elections. Arkansas, appearing in the person of Secretary of State Charlie Daniels, defends the statute. Secretary Daniels urges that the important state interests in regulating and managing elections justify any burdens imposed on the

Green Party.  With one exception (which will be explained in due course), this

Court has jurisdiction over the Green Party's claims and personal jurisdiction

over all the parties; venue is proper too.

## I.

The challenged statute, which is part of the definitional section of

Arkansas's election code, says this:

> (21)(A) "Political party" means any group of voters that at the last preceding general election polled for its candidate for Governor in the state or nominees for presidential electors at least three percent (3%) of the entire vote cast for the office.
>
> (B) A group of electors shall no[t] assume a name or designation that is so similar in the opinion of the Secretary of State to that of an existing political party as to confuse or mislead the voters at an election.
>
> (C)  When any political party fails to obtain three percent (3%) of the total votes cast at an election for the office of Governor or nominees for presidential electors, it shall cease to be a political party;

Ark. Code Ann. § 7-1-101(21)(A–C).  The Green Party concentrates its fire on

subdivision (C).  This part makes a party's success in gubernatorial and

presidential elections the path to continued ballot access.

Arkansas law provides another path for political parties to be recognized and get their candidates on the ballot: a petition. Ark. Code Ann. § 7-7-205 (Supp. 2009). In addition to meeting some housekeeping requirements, the petition must contain the signatures of at least ten thousand registered voters; and the signatures must be gathered during any ninety-day period. Ark. Code Ann. § 7-7-205(a)(1), (2) & (4). The Green Party makes no constitutional challenge to the ten-thousand-signatures requirement. It would be hard pressed to do so. This statutory requirement is the fruit of the Green Party's prior ballot-access litigation in this Court. *Green Party of Arkansas v. Daniels*, 445 F. Supp. 2d 1056, 1062–63 (E.D. Ark. 2006).

## II.

The Green Party first argues that Ark. Code Ann. § 7-1-101(21)(C) is ambiguous. That ambiguity, the Party says, has led Secretary Daniels to misinterpret the statute. Pointing to its success in getting more than 3% of the votes cast in the 2008 elections for the United States Senate and three seats in the United States House of Representatives, the Green Party asks this Court to interpret the Arkansas statute as embracing this success and order Secretary Daniels to recognize the group's continued viability as a political party under

3

state law.

This federal Court, however, lacks jurisdiction to "award injunctive relief against State officers on the basis of state law." *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 91 (1984). The Eleventh Amendment bars the claim because it is, in essence, a claim against Arkansas personified by the Secretary of State in his official capacity. "In short, the principle of sovereign immunity is a constitutional limitation on the federal judicial power established in Art[icle] III [of the Constitution] . . .." 465 U.S. at 98.

The Eleventh Amendment bar holds notwithstanding Congress's post-*Pennhurst* enactment of the supplemental jurisdiction statute, 28 U.S.C. § 1367. *Raygor v. Regents of University of Minnesota*, 534 U.S. 533, 539–42 (2002). And it is no answer to insist, as the Green Party does, that Secretary Daniels is an indispensable party under state law. He is—because Secretary Daniels is the State of Arkansas in the administration of elections.

> A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh

Amendment.

*Pennhurst*, 465 U.S. at 106.  The Court denies the Green Party's motion for partial summary judgment on its state-law claim because no jurisdiction exists to consider that claim on the merits.

### III.

The Green Party argues second that Arkansas's ballot-access statute unconstitutionally burdens the associational rights of the Party and its members—the right to band together with like-minded citizens as a political party, while pursuing a common agenda and rallying voters around that agenda.  This is the hub of the case.  And here the Court faces a clash of important interests.

Arkansas's party-definition statute undoubtedly burdens "two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively.  Both of these rights, of course, rank among our most precious freedoms." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968).  It is beyond debate that the First and Fourteenth Amendments protect these rights. *Tashjian v. Republican Party of Connecticut*,

479 U.S. 208, 214 (1986).  Whether cast in terms of the First Amendment as associational rights, or the Fourteenth Amendment as a matter of equal protection, members Kennedy and Swaney, as well as the Green Party, enjoy these fundamental rights. *Ibid.*; *Republican Party of Arkansas v. Faulkner County, Arkansas*, 49 F.3d 1289, 1293 n.2 (8th Cir. 1995).

On the other hand, Arkansas has "admittedly vital interests," *American Party of Texas v. White*, 415 U.S. 767, 782 (1974), in organizing and regulating elections.  The Constitution grants the several States "broad power to prescribe the 'Times, Places and Manner of holding Elections for Senators and Representatives,' Art. I, § 4, cl. 1, which power is matched by state control over the election process for state offices." *Tashjian*, 479 U.S. at 217.  It is "clear that States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997); *see also Burdick v. Takushi*, 504 U.S. 428, 433 (1992); *Jenness v. Fortson*, 403 U.S. 431, 442 (1971).

To resolve this clash—to decide whether Arkansas's party-definition statute offends the Constitution—this Court must make "hard judgments." *Storer v. Brown*, 415 U.S. 724, 730 (1974).  The Green Party and Secretary

Daniels agree on the legal standard governing these judgments. This Court "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the [Green Party] seeks to vindicate' against 'the precise interests put forward by [Arkansas] as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the [Green Party's] rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

This standard, as the Supreme Court has recognized, provides no bright lines. *Timmons*, 520 U.S. at 359. Instead, this Court must discern where this case falls on a sliding scale of scrutiny. "Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Timmons*, 520 U.S. at 358 (internal quotation omitted).

**IV.**

Secretary Daniels has moved for summary judgment, contending that no genuine issues of material fact exist and that he is entitled to judgment as a matter of the governing law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Reed v. Woodruff County, Arkansas*, 7 F.3d 808, 810 (8th Cir. 1993). The Green Party contends that it is entitled to a trial. It points, in particular, to what it says are disputed facts about the burdens that Ark. Code Ann. § 7-1-101(21) puts on the Party's shoulders. The Green Party frames the issue this way: if the record contains enough evidence to justify the Court in concluding that the statute imposes a heavy burden, then the Court should deny summary judgment because Secretary Daniels does not argue that the statute would survive strict scrutiny; on the other hand, the Party says, if the Court concludes that less-exacting scrutiny applies, then the question is whether Secretary Daniels has established as a matter of law that legitimate and important state interests justify applying the statute to the Green Party. The Court generally agrees that, under the precedents, this formulation captures the issues for decision on Secretary Daniels's motion.

8

Notwithstanding the voluminous evidentiary record diligently compiled by the parties, the Court concludes that the material facts are relatively few. Most of them are undisputed. And the Court assumes the disputed facts to be as the Green Party asserts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Taylor v. White*, 321 F.3d 710, 715 (8th Cir. 2003). Viewed in this way, the case is ripe for summary judgment.

The Green Party identifies five ways in which Ark. Code Ann. § 7-1-101(21)'s vote requirement burdens its associational rights. First, the statute undermines the Party's right to choose which races to run by requiring the Party to field candidates in gubernatorial and presidential elections when it would rather focus on local or otherwise uncontested races. Rather than solving this problem, the petition alternative impales the Party on what it calls a Morton's Fork—a choice between two bad prospects—because petition drives are expensive in both dollars and effort. Second, the statute discriminates against bottom-up parties (like the Green Party) that choose to focus on local elections and local organizing. Third, the Green Party points to history: only one party has met the 3% threshold in a presidential election (the Reform Party in 1996), while third-party candidates in gubernatorial or

presidential elections have come up short approximately fifty times. This history, the Green Party says, shows that the statutory standard is almost impossible to meet. Fourth, the Party says that it has little or no control over the national Green Party's presidential campaign: the recent candidates were not from Arkansas, did not come to Arkansas, and were not chosen by the Green Party of Arkansas. Fifth, and finally, the Green Party contends that having to petition every two years imposes what is essentially a heavy tax on the Party's coffers and people. This point overlaps with the first; having to divert resources to repeated petition drives is the second prong of the Morton's Fork.

Secretary Daniels counters that Arkansas's ballot-access scheme imposes reasonable, non-discriminatory restrictions that further legitimate and constitutionally acceptable interests. First, the party-definition statute and the petition statute reserve access to the general election ballot for political parties that can demonstrate substantial support among Arkansas voters. The limitations are thus in service of reducing voter confusion, ballot overcrowding, and frivolous candidacies in the general election. Second, Secretary Daniels urges that Arkansas's interest in avoiding the increased

election costs associated with more primaries and runoffs likewise supports the State's ballot-access limitations.

## V.

How heavy are the statutory burdens on the Green Party's First and Fourteenth Amendment rights?  The Court concludes that these burdens "—though not trivial—are not severe." *Timmons*, 520 U.S. at 363.

**1.**  The Court must, as the parties recognize, consider how Arkansas law as a whole regulates political parties' access to the general election ballot. *E.g.*, *Republican Party of Arkansas*, 49 F.3d at 1299–1301.  The party-definition statute cannot be viewed in isolation; the Court must consider the petition statute too.

The most powerful fact material to the Green Party's claim is the Party's track record of actually getting on the ballot.  Three times in the last few years the Party has petitioned for access.  Three times it has succeeded.  "Past experience will be a helpful, if not always an unerring, guide:  it will be one thing if [the Green party has] qualified with some regularity, and quite a different matter if [it has] not." *Storer*, 415 U.S. at 742.  Assuming that Ark. Code Ann. § 7-1-101(21)'s requirement that a party get 3% of the vote in gubernatorial and presidential elections is really no path at all for a nascent

11

party, Arkansas has still not frozen the political status quo. *Jenness*, 403 U.S. at 439–40. The Green Party proved this point in 2006, in 2008, and again just a few weeks ago.

Yes, access in 2006 required litigation in this Court. But access was achieved for that election, and Arkansas amended the statute in response to this Court's decision. Yes, the petition drives cost the Green Party time, effort, and money. The petition drive cost the Party approximately $40,000.00 in 2006, approximately $30,000.00 in 2008, and approximately $14,000.00 in 2010. In each of these drives, the Party spent all of its available funds. But the Constitution does not require that states make ballot access either free or easy. *Timmons*, 520 U.S. at 366–67. "Hard work and sacrifice by dedicated volunteers are the lifeblood of any political organization." *American Party*, 415 U.S. at 787. This history shows, moreover, a significant decline in the Green Party's out-of-pocket expenses in petitioning for party recognition.

The Green Party rightly trumpets its success in the 2008 elections: its candidate for the U.S. Senate received 207,076 votes; and its candidates in three of the State's four congressional districts received between 32,603 and 64,398 votes each. The Party achieved this success in 2006 and 2008 even

though the preceding petition drives, like the one this year, emptied the Party's bank account and exhausted party members.   Securing 10,000 signatures from the 1,612,929 registered voters in Arkansas—about six-tenths of one percent—within any ninety-day period of the Green Party's choosing, Ark. Code Ann. § 7-7-205(a), the Court concludes, is simply not a severe burden for a political party that has achieved election results like these across Arkansas. These results demonstrate, moreover, that petitioning has not been a death knell for the Party in the general elections.   The Green Party's continued success in petitioning for ballot access, and its success in getting votes once its candidates are on the ballot, undermine the Party's characterization of being impaled on a Morton's Fork by Arkansas law.

**2.**  Neither the availability of the petition process, nor the Green Party's history of success in that process, however, responds to the Party's deeper point about its First Amendment right to choose which races to run, how to organize and operate itself, and where to spend its money.   This point underlies several of the burdens asserted by the Party:  the alleged Morton's Fork; the statutes' alleged discrimination against bottom-up parties; and the lack of control over presidential candidates.   Here the Green Party stands on

cases such as *California Democratic Party v. Jones*, 530 U.S. 567, 574–76 (2000), *Eu v. San Francisco County Democratic Central Committee*, 489 U.S. 214, 230 (1989), and *Tashjian*, 479 U.S. at 214, as well as *dicta* in a First Circuit decision, *Maine Green Party v. Maine, Secretary of State*, 173 F.3d 1, 3–4 (1st Cir. 1999).

Based on existing law, the Court rejects this burden argument from party autonomy.   First, none of the Green Party's precedents from the Supreme Court involve a challenge to a ballot-access statute like Ark. Code Ann. § 7-1-101(21).   There is no Eighth Circuit precedent on point either. Second, this argument proves too much.  While the party-autonomy principle recognized in *Jones*, *Eu*, and *Tashjian* has great constitutional power, it cannot be absolute.   If these cases mean what the Green Party says, then *Jenness*, *American Party*, *Munro v. Socialist Workers Party*, 479 U.S. 189 (1986), and the host of lower court decisions approving ballot-access restrictions based on performance in particular elections or getting signatures on petitions cannot stand.  A nascent party would be entitled to overcome a state's strong interest in limiting ballot access to parties with significant support by saying "we choose not to run this race" or "we choose not to spend our money on a petition drive."  This nascent-party veto has not, as far as this Court can tell,

14

been adopted in any case.  As Judge Campbell noted in his concurrence in *Maine Green Party*, any such "major jurisprudential leap" must be made by the Supreme Court.  173 F.3d at 8–9.

**3.**  The Court is not convinced, finally, that Ark. Code Ann. § 7-1-101(21) discriminates against the Green Party because it lacks control over the national Green Party's presidential campaign in Arkansas.  Arkansas has six votes in the Electoral College.  U.S. Const. art. 2, § 1, cl. 2.  The Green Party has not demonstrated that the major political parties in Arkansas have any greater control over their parties' presidential campaigns.  The burden imposed by this facially neutral provision falls on every party in a state like Arkansas that has few electoral votes to offer.  In any event, the Green Party's burden in this regard is not a severe one.

## VI.

Now to Arkansas's interests asserted in justification for the burden its ballot-access statutes impose on the Green Party's constitutional rights.  Having concluded that the burden is not severe, the Court undertakes the "less exacting review" required by precedent.  *Timmons*, 520 U.S. at 358.

This review is not the rational-basis inquiry advocated by the State. The Court does not ask whether any possible reasoned basis exists for the statutes. *Cf. Independent Charities of America v. Minnesota*, 82 F.3d 791, 797 (8th Cir. 1996). Instead, as required by *Anderson* and like cases, the Court must evaluate the precise interests advanced by the State. Those interests need not be compelling. And Arkansas's statutes need not be narrowly drawn to minimize the interference with the Green Party's constitutional rights; the statutes must instead be reasonable and nondiscriminatory. *E.g.*, *Timmons*, 520 U.S. at 358. The Court must also consider the extent to which the State's interests require the burden on the Green Party's rights. *E.g.*, *Burdick*, 504 U.S. at 434. This is less than strict scrutiny, but more than garden-variety, rational-basis review.

The Green Party agrees that Arkansas has important interests in limiting the general election ballot to parties and candidates with significant support. The "State's admittedly vital interests are sufficiently implicated to insist that political parities appearing on the general ballot demonstrate a significant, measurable quantum of community support." *American Party*, 415 U.S. at 782. Arkansas's strong interests here justify substantial regulation to achieve order

16

and stability in the democratic process.  *Timmons*, 520 U.S. at 366–67; *Burdick*, 504 U.S. at 433.  The specific problems that Arkansas seeks to avoid are ballot overcrowding, voter confusion, and frivolous candidacies.  The State's objective in avoiding these and like problems, the Supreme Court has said, is "compelling." *American Party*, 415 U.S. at 782 n.14.  The precedents approve the constitutional reasonableness of Arkansas's substantial-support justification "with unmistakable clarity." *Munro*, 479 U.S. at 194.

Arkansas defends the reasonableness of its ballot-access statutes by pointing to both precedent and practice.  The Supreme Court has repeatedly approved statutes imposing similar or heavier burdens on parties and candidates seeking access to the general ballot.  *E.g.*, *Jenness*, 403 U.S. at 433 (candidate must receive 20% of the vote required at prior gubernatorial or presidential election; or present a petition signed by 5% of the total votes cast in previous race for the office for which candidate seeks); *American Party of Texas*, 415 U.S. at 773–74 n.6, 777 (candidate must poll more than 2% of total votes cast for governor in last election; or present a petition listing 1% of total votes cast for governor at last general election).  Courts of Appeals around the

country have approved similar or heavier statutory burdens too.[*]

The Green Party's expert, Dr. Richard Winger, made the practice point on deposition. He testified that fifteen states (including Arkansas) link party status with performance in a past election. Of those fifteen states, eight (including Arkansas) make the link between the immediately preceding gubernatorial or presidential election and party status. As the Constitution contemplates, of course a salutary variation exists among the states in the particulars of their election statutes. The point the Court draws is more basic: Arkansas's statutory link between gubernatorial and presidential election

---

[*]*E.g., Rainbow Coalition of Oklahoma v. Oklahoma State Election Board*, 844 F.2d 740, 741–42 (10th Cir. 1988) (candidate must present petition with at least 5% of total votes cast in the last general election for governor or for electors for president and vice president; or a party nominee for governor or its nominees for electors for president and vice president must get at least 10% of total votes cast in any general election); *McLaughlin v. North Carolina Board of Elections*, 65 F.3d 1215, 1218–19 (4th Cir. 1995), *cert. denied*, 517 U.S. 1104 (1996) (candidate must file petition, with some qualifications, signed by 2% of total number of votes cast in the most recent general election for governor; or a party's nominee for governor or president must poll 10% of the votes cast in previous general election for governor or president); *Libertarian Party of Maine v. Diamond*, 992 F.2d 365, 367 (1st Cir. 1993) (candidate must present petition with at least 5% of votes cast in preceding gubernatorial election; or party may organize around a prior candidate for the office of governor or president who, among other things, received more than 5% of the total Maine vote cast for governor or president in the preceding gubernatorial or presidential election); *Rogers v. Corbett*, 468 F.3d 188, 190–91 (3d Cir. 2006) (party candidate, with some qualifications, must poll at least 2% of largest entire vote cast in Pennsylvania for any elected candidate; or candidate must present petition containing 2% of the vote total for the candidate who obtained the highest number of votes for state-wide office in the previous election).

performance and party status is hardly extraordinary.

The Green Party challenges the State's reliance on avoiding voter confusion, ballot overcrowding, and frivolous candidacies as justifications for its ballot-access regime. Relying on its expert witness, the Party points out that Arkansas has one of the least crowded ballots in the nation. But the Supreme Court has been clear that a State need not have experienced these election problems before acting to avoid them. "We have never required a State to make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access." *Munro*, 479 U.S. at 194–95.

The Green Party challenges Ark. Code Ann. § 7-1-101(21)'s reliance on presidential elections, arguing that the results in these elections are both under- and over-inclusive in measuring a political party's support in the State. Here again the Green Party stands on expert-witness testimony offered in opposition to summary judgment. This kind of argument, however, turns on how narrowly the statute is tailored. Because the statutory burden on the Green Party is not severe, Arkansas's party-definition statute need not be

narrowly tailored.  Under the precedents, linkage to the presidential election is reasonable.  *E.g.*, *Jenness*, 403 U.S. at 433; *McLaughlin*, 65 F.3d at 1219.

The Green Party also challenges Ark. Code Ann. § 7-1-101(21) as the discriminatory product of the General Assembly's desire to keep the American Party off the ballot in the early 1970s.  The Party points out that only one party (the Reform Party) has maintained its status under the statute's 3% threshold.  This history weighs in the balance.  *Storer*, 415 U.S. at 742.

The statute and its companion authorizing access by petition do discriminate:  they discriminate against new political parties that cannot make, and continue to make, a preliminary showing of substantial community support.  *Munro*, 479 U.S. at 194.  "The Constitution permits the [Arkansas General Assembly] to decide that political stability is best served through a healthy two-party system."  *Timmons*, 520 U.S. at 367.  The Constitution does not permit the major parties to block out all competing parties.  This was the constitutional problem with the web of Ohio statutes in *Williams*.  Courts should recognize that the legislators who write these statutes have an interest in maintaining the political status quo.  *Clingman v. Beaver*, 544 U.S. 581, 603 (2005) (O'Connor, J., concurring).  But "[r]ecognition of that basic reality need

20

not render suspect most electoral regulations." *Ibid*. "And while an interest in securing the perceived benefits of a stable two-party system will not justify unreasonably exclusionary restrictions, States need not remove all of the many hurdles third parties face in the American political arena today." *Timmons*, 520 U.S. at 367 (internal citation omitted). A statutory scheme like Arkansas's that discriminates between parties with substantial community support and those without it, based on election performance and a viable petition option, is neither unreasonable nor invidiously discriminatory.

Arkansas also asserts its interest in avoiding increased costs for more primaries and runoffs involving parties whose candidates are unlikely to win. While election costs are relevant, the Green Party is correct that Arkansas may not rely solely on cost avoidance to justify restricting ballot access. *Tashjian*, 479 U.S. at 218. Arkansas does not advance a cost-only justification. But the Court need not explore this issue because the State's main justification — limiting the general ballot to parties with substantial community support so as to avoid overcrowding, confusion, and candidates having little or no prospect of winning — is sufficient as a matter of law to justify Ark. Code Ann. § 7-1-101(21) in light of Ark. Code Ann. § 7-7-205.

\* \* \*

Arkansas's ballot-access statutes burden the Green Party's First and Fourteenth Amendment rights, but they do so modestly, not severely.  Under the less-exacting review prescribed by precedent for a challenge against that kind of regulation, the Court concludes that Ark. Code Ann. § 7-1-101(21) as tempered by Ark. Code Ann. § 7-7-205 is reasonable, not invidiously discriminatory, and justified by Arkansas's important regulatory interests in being a good steward of its elections.  The Court therefore grants Secretary Daniels's motion for summary judgment, *Document No. 37*.

## VII.

There are three loose ends.  First, the Green Party has moved to strike the affidavit of Dr. Gary Wekkin, one of the State's experts.  The Court relied on Wekkin's deposition, not his affidavit, in deciding the motion for summary judgment.  The Court therefore denies the motion, *Document No. 58*, as moot.

Second, the Green Party has also moved *in limine* to exclude the deposition testimony (and potential trial testimony) of Bill Vickery, another State expert, under Federal Rule of Evidence 702.  The Court did not to rely on Vickery's deposition in deciding whether to grant summary judgment.  So

this motion, *Document No. 60*, is denied as moot too.

Third, and finally, the Green Party has moved to strike the part of Secretary Daniels's recent supplemental brief which cited FEDERALIST NO. 10 and asserted the State's interest in limiting political factionalism as a justification. The Green Party says that this is a new justification, belatedly asserted. Given the context, this phrase was probably Secretary Daniels's attempt to put a new suit on the State's oft-repeated justifications — avoiding ballot overcrowding, voter confusion, and non-viable candidates. The Court nonetheless did not consider avoiding factionalism as a justification in its summary-judgment analysis. This motion, *Document No. 77*, is likewise denied as moot.

So Ordered.

*DPMarshall Jr.*

D.P. Marshall Jr.
United States District Judge

29 July 2010

23